IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 127,290

STATE OF KANSAS,
*Appellee*,

v.

LAROY M. WEST,
*Appellant*.

SYLLABUS BY THE COURT

1.

Appellate courts review joinder issues in three steps: whether joinder was statutorily permitted, whether the district court abused its discretion in granting or denying joinder, and whether any error prejudiced a party's substantial rights.

2.

K.S.A. 22-3202(1) permits joinder of crimes that are of the same or similar character, arise from the same act or transaction, or arise from acts or transactions connected together or constituting parts of a common scheme or plan. Whether a statutory basis for joinder exists presents a mixed question of fact and law, with factual findings reviewed for substantial competent evidence and the legal conclusion reviewed de novo.

3.

Crimes need not be identical to be of the same or similar character for purposes of joinder. Nevertheless, joinder must be supported by multiple commonalities between the offenses and not merely by broad similarities or a shared classification.

1

4.

Joinder under K.S.A. 22-3202(1) does not depend on whether evidence of the joined crimes would be independently admissible as other-crimes evidence under K.S.A. 60-455.

5.

Claims of instructional error are reviewed under a three-step framework: whether the issue is reviewable, whether the challenged instruction was legally and factually appropriate, and, if error occurred, whether the error requires reversal. In determining whether an instruction was legally and factually appropriate, an appellate court exercises unlimited review of the entire record and views the evidence in the light most favorable to the requesting party.

6.

An instruction is legally appropriate when it fairly and accurately states the applicable law. An instruction is factually appropriate when sufficient evidence, viewed in the light most favorable to the requesting party, would support giving the instruction.

7.

Whether an evidentiary ruling violated a defendant's constitutional right to present a defense is subject to unlimited appellate review. The right to present a defense is subject to the rules of evidence and procedure and is violated only when relevant, noncumulative, and otherwise admissible evidence supporting the defense theory is excluded.

Appeal from Sedgwick District Court; BRUCE BROWN, judge. Oral argument held April 9, 2026. Opinion filed July 24, 2026. Affirmed.

*Michelle A. Davis*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

STANDRIDGE, J.: This is Laroy West's direct appeal following his convictions for first-degree premeditated murder and two counts each of aggravated assault and criminal possession of a weapon resulting from two separate incidents. West raises several claims of trial error, alleging the district court erred in denying his motion to sever the charges, in instructing the jury in several respects, and in excluding evidence relevant to his claim of self-defense. West also argues for relief under the cumulative error doctrine.

We affirm West's convictions. The district court correctly denied severance because the charges from each incident were of the same or similar character under K.S.A. 22-3202(1), the alleged instructional errors each lack merit, and the district court properly excluded irrelevant evidence. In the absence of errors to accumulate, West's cumulative error argument necessarily fails.

FACTUAL AND PROCEDURAL BACKGROUND

Around 10 p.m. on May 5, 2021, a Black man wearing a blue baseball cap and carrying a backpack entered a Wichita QuikTrip on North Broadway, blaring music on a Bluetooth speaker. Will Robinson, a QuikTrip security guard, confronted him about the

loud music, and the two men argued as Robinson escorted the man outside. The men continued to exchange words as Robinson walked the man through the QuikTrip parking lot to the edge of the street. Robinson watched as the man crossed the street into an alley. A witness who was getting gas at the QuikTrip heard the man call Robinson a coward and say, "[Y]ou wanna come say that over here[?]" and, "[Y]ou won't come over here, you ain't gonna do nothing." Robinson then ran across the street into the alley, where the two men began wrestling. Another witness who was driving out of the QuikTrip parking lot saw Robinson moving his hands with his palms out in an apparent attempt to get the man to "chill" or calm down. The witness then saw the man pull out a gun and shoot Robinson. After the shooting, the man fled in the opposite direction of the QuikTrip.

Law enforcement responded to the scene, where they discovered Robinson unresponsive with blood covering his face. Robinson was wearing a gun belt with a firearm and a taser. The pistol was still in its holster, and there were no weapons in Robinson's hands. Robinson was transported to the hospital, where he later died from injuries sustained as a result of the gunshot wound.

Law enforcement's investigation led them to review surveillance video inside and outside the QuikTrip. Attempting to identify the suspected shooter, investigators circulated still shots from the QuikTrip video to other law enforcement officers in the area. A detective recognized the shooting suspect as matching the description of the suspect in an unsolved aggravated assault case that also occurred on North Broadway a few weeks before the shooting.

In that case, Edward Sebastian, an owner of La Chinita Mexican restaurant reported that he went to the restaurant with his stepson, Fernando David Mendez, on the afternoon of March 28, 2021. The restaurant was closed to the public because it was a Sunday, but Sebastian and Mendez were there to work on a catering order. Upon arrival

4

in the parking lot behind the restaurant, Sebastian saw a Black man wearing a blue baseball cap and carrying a backpack walk through the parking lot. When Sebastian asked if he needed something, the man responded with profanity. After Sebastian warned the man that he was on private property and needed to leave, the man began arguing with Mendez and it appeared the situation might turn physical. The man pulled up his shirt to reveal a firearm tucked in his waistband, and Mendez ran for cover behind the restaurant. The man continued to argue with Sebastian, who pointed out a nearby surveillance camera. Sebastian then reached for his phone to call 911, and the man began walking away. While on his phone, Sebastian followed the man to the edge of the parking lot. The man was in the street when he turned around and ran back toward Sebastian with his gun out, aiming it at Sebastian. After Sebastian started backing away, the man left the scene.

On both occasions, the Black male suspect was carrying a backpack and was wearing a blue baseball cap, jeans, and boots. Based on the suspect's description, law enforcement identified and arrested West. The State charged him in a single complaint with six crimes between the two incidents. For the March incident at La Chinita, the State charged West with two counts of aggravated assault and a single count of criminal possession of a weapon. For the May incident outside QuikTrip, the State charged him with first-degree premeditated murder, aggravated assault, and criminal possession of a weapon.

West moved to sever the March and May charges. At a hearing on the motion, the district court considered evidence and oral argument from the parties before denying West's request to sever the charges.

The case proceeded to trial, where the State presented the evidence outlined above.

West testified in his defense, asserting his actions in both cases were justified by self-defense. West said that when he arrived at QuikTrip on the night of May 5, Robinson came outside, "approached [him] in a very aggressive manner," and accused West of interfering with his drug customer clientele. West testified that he had previously encountered Robinson, who he claimed had a reputation as a bully. Once inside the store, West said Robinson was angry and aggressive, telling him to turn his music down and leave. When West tried to leave, Robinson walked next to him saying, "[Y]ou always wanna fight," and threatening to "beat [West's] ass to death." West alleged that Robinson continued to threaten him after West crossed the street to get away. He said that Robinson became enraged and followed him across the street. According to West, Robinson punched him, yelling that he was "gonna beat [West's] ass" and beat West "to death" while West begged Robinson to let him go. West said that Robinson shoved him, put something on his hands, and then moved toward him again with his hands up in a "fight stance." Claiming he was in fear for his life, West unzipped his backpack, pulled out his gun, and fired once. West said he fled the scene because he did not want to explain to the police that he had just shot an officer for attacking him. West denied punching, taunting, or calling Robinson a coward. West admitted that Robinson never pulled out a gun during the encounter.

West similarly maintained that he was forced to defend himself during the March incident at La Chinita. West testified that he was walking through the parking lot, trying to avoid any interaction with Sebastian and Mendez, when Mendez threatened to "stomp [West's] head down on the concrete." West said that both men moved towards him; fearing for his safety, he lifted his shirt up to show his gun. West claimed that when he started to leave, he believed Sebastian had a firearm, so he drew his gun to defend himself.

6

The jury acquitted West of the May aggravated assault charge and convicted him of the five remaining charges. The district court sentenced West to life without the possibility of parole for 618 months for first-degree murder, consecutive to a controlling 62-month sentence for the other crimes.

West directly appealed his convictions to this court. Jurisdiction is proper. See K.S.A. 60-2101(b) (Supreme Court jurisdiction over direct appeals governed by K.S.A. 22-3601); K.S.A. 22-3601(b)(3)-(4) (life sentence and off-grid crime cases permitted to be directly taken to Supreme Court); K.S.A. 21-5402(b) (first-degree murder is off-grid person felony).

ANALYSIS

West makes several arguments on appeal that may be combined into the following issues: (1) the district court erred in denying his motion to sever the March and May charges; (2) the district court erred in issuing an initial aggressor instruction and in instructing or failing to instruct the jury on certain lesser included offenses; (3) the district court erroneously granted the State's motion in limine, which prevented admission of evidence relevant to West's claim of self-defense; and (4) the cumulative effect of these errors resulted in an unfair trial. We address each issue in turn.

I.   *Motion to sever*

West argues the district court erred in denying his motion to sever, claiming that improper joinder of the March and May charges prejudiced his substantial rights and deprived him of a fair trial. The State responds that the district court correctly denied severance of the charges.

7

*Standard of review*

An appellate court reviews potential joinder errors using a three-step analysis, applying a different standard of review at each step. First, the court determines whether K.S.A. 22-3203 permits joinder. Under that statute, multiple complaints against a defendant may be tried together if the State could have brought the charges in a single complaint. K.S.A. 22-3202(1) sets forth the three conditions permitting the joinder of multiple crimes in a single complaint: (1) the charges must be of the "same or similar character"; (2) the charges are part of the "same act or transaction"; or (3) the charges result from "two or more acts or transactions connected together or constituting parts of a common scheme or plan." Whether one of these conditions is satisfied is a fact-specific inquiry, meaning the appellate court will review the district court's factual findings for substantial competent evidence. We review de novo the legal conclusion that one of the conditions is met. *State v. Ritz*, 305 Kan. 956, 961, 389 P.3d 969 (2017); see *State v. Smith*, 312 Kan. 876, 887, 482 P.3d 586 (2021) (Substantial competent evidence refers to legal and relevant evidence that a reasonable person could accept as being adequate to support a conclusion.).

Second, because K.S.A. 22-3202(1) provides that charges "may" be joined, a district court has discretion to deny a joinder request even if a statutory condition is met. We review this decision for abuse of discretion. *State v. Hurd*, 298 Kan. 555, 561, 316 P.3d 696 (2013).

Third, if an error occurred in the preceding steps, we determine whether the error resulted in prejudice, i.e., whether the error affected a party's substantial rights. See K.S.A. 60-261; *State v. Carter*, 311 Kan. 783, 793, 466 P.3d 1180 (2020). On appeal from a denial of a motion to sever, the party benefitting from the error is responsible for

8

demonstrating there is no reasonable probability the error affected the trial's outcome considering the entire record. *Hurd*, 298 Kan. at 564.

*Discussion*

A. *Step one: fact-specific statutory conditions that permit joinder*

We begin our analysis by engaging in a fact-specific inquiry to determine whether the March and May crimes were properly joined in a single complaint.

At a hearing on West's motion to sever, the State presented testimonial evidence from Wichita Police Detective Donald Moore. He testified about his response to the scene of the May shooting, the collection of evidence at the scene, and law enforcement's investigation to identify a suspect. This investigation included taking still shots of the suspect from the QuikTrip surveillance video and emailing them to the law enforcement community in Sedgwick County. In response, another Wichita police detective contacted Moore and advised that the suspect was likely involved in one of his cases—the March La Chinita incident that had occurred about five weeks before the shooting and just a few blocks away from the QuikTrip. Detective Moore also testified that when he presented the May case to the district attorney's office for potential charges, he presented the March case alongside it because evidence from both cases helped to identify West as the suspect in each case. Detective Moore noted that the suspect in both cases had the same physical appearance, wore the same hat and similar clothing, and used a firearm. Finally, Detective Moore testified that after West's arrest, one of the La Chinita victims identified him as the suspect in that case.

9

After considering this evidence and arguments from the parties, the district court judge found that the alleged crimes were properly joined under the first condition of K.S.A. 22-3202(1) because they were of the same or similar character:

> "[B]oth of these incidents occur in public areas, businesses, dealing with employees of businesses, LaChinita on the one hand, Quik Trip on the other. Both on North Broadway area, within a few blocks of each other. Additionally, they both involve, initially anyway, aggravated assault type allegations, they are these confrontations, verbal confrontations initially, in these public areas, outside of these businesses. In both cases there is a firearm and there's evidence to believe the same firearm in each of these offenses that is alleged to be a part of the crime.
>
> "So it's a situation where there's an angry interchange that escalates, allegedly, to criminal conduct, aggravated assault, murder, death. So when you look at these what's going on, what's being charged, it is crimes—or allegations, let me say that, that are the same or similar character. This is the same type of scenario, very similar, very close in time, five weeks."

The judge also found joinder was proper under the third condition of K.S.A. 22-3202(1) because the alleged crimes constituted parts of a common scheme or plan:

> "I also am going to find that the third basis for joinder is here, as well, that two or more acts constituting a common scheme or plan. And again, I think what is going on here is a situation where the State—the common scheme here, the common plan is a confrontation with a business owner or business employee, on the North Broadway area, that gets escalated and allegedly involves threats and a firearm used or brandished as a part of it.
>
> "So it seems like it falls into that, it's this common—allegedly common scheme, common plan, common way that is being alleged that Mr. West relates or ways that he behaves in these public areas, on North Broadway, when there is disagreement or

disharmony or miscommunication, or bad exchange, an angry or hostile exchange or encounter. So I think it constitutes a common scheme or plan."

Finally, the judge discussed the difficulty in separating the March and May crimes, given the overlapping evidence between the two sets of crimes in proving West's identity:

"So one of the other difficult things with this identity is on multiple levels. One is the LaChinita case, March case, the identity comes out of the investigation in the May case, the Quik Trip case. And so just for the jury to understand and be able to follow the evidence and not be confused as to oh, that's how this happened, because otherwise it may look like, really identify? I mean, that doesn't make sense, or what context, all of that, I think, requires that.

"We also have the same hat, same clothing, the DNA evidence that's on the hat that's seen being worn by Mr. West in the March case, that needs to—the State needs to be able to present that for identity to hey, this hat where we've got DNA, it is associated with Mr. West and it looks like it—in this video from the May case, it looks like it might be from the March case. And again, the evidence gets—the type of evidence, the common scheme or plan, similar character—same or similar character, it gets mixed together. So for those reasons, I'll deny the motion to sever."

1. *Condition one:  same or similar character*

West first challenges the district court's ruling that the March and May crimes were of the same or similar character. He does not contest the court's factual findings on this factor, so the issue before us is whether those facts support consolidation.

In discussing whether crimes are of the same or similar character to permit joinder, this court has said:  "'Several separate and distinct felonies may be charged in separate counts of one and the same information, where all of the offenses charged are of the same

11

general character, requiring the same mode of trial, the same kind of evidence, and the same kind of punishment.'" *State v. Barksdale*, 266 Kan. 498, 507, 973 P.2d 165 (1999) (quoting *State v. Hodges*, 45 Kan. 389, 392, 26 P. 676 [1891]). This is not a particularly onerous standard. "The 'same or similar character' language of K.S.A. 22-3202(1) does not limit joinder to only those crimes that are clones of each other. Such a narrow interpretation would frustrate the very purpose of the joinder statute." *State v. Bunyard*, 281 Kan. 392, 403, 133 P.3d 14 (2006), *disapproved of on other grounds by State v. Flynn*, 299 Kan. 1052, 329 P.3d 429 (2014). But courts should not rely solely on generalities when considering whether joinder was proper; consolidation or joinder is generally appropriate when crimes have "multiple commonalities, not merely the same classification of one of the crimes charged." *State v. Smith-Parker*, 301 Kan. 132, 157, 340 P.3d 485 (2014).

West contends that the district court's stated reasons for finding the crimes were of the same or similar character were not sufficient to warrant joinder. He focuses on the differences between the March aggravated assault charges (use of force in threatening with a gun, a severity level 7 felony) and the May premeditated murder charges (use of deadly force in shooting a gun, an off-grid crime). Other than the fact that both incidents involved a firearm, West claims the crimes are not of the same or similar character because they differ both in conduct and in the intended result and also require different evidence to establish each crime.

But West's arguments ignore the many commonalities between the two sets of crimes. On both occasions, which took place approximately five weeks apart, West was on private business property on North Broadway in Wichita when he became involved in a verbal altercation with an employee. Each time, West was asked or told to leave the premises. Rather than comply, West continued to argue with the employee. West was armed and displayed the same firearm on both occasions. Although West shot no one

12

during the March incident, he threatened violence with his gun. The State charged West with aggravated assault and criminal possession of a weapon in both incidents. The two events are further connected by the evidence used to identify West as the suspect in both cases. West was carrying a backpack and wearing the same baseball cap on both days. The detective working the March case recognized West when he saw the still photographs from the QuikTrip surveillance cameras. And Sebastian identified West as the man he encountered in the La Chinita parking lot after West was arrested for the May shooting. In addition to the crimes requiring at least some of the same evidence, both sets of crimes require the same mode of trial (trial by jury) and punishment (incarceration).

Indeed, this court has regularly upheld similar "commonalities" as sufficient to permit joinder under K.S.A. 22-3202(1). See, e.g., *Ritz*, 305 Kan. at 963-64 (finding two sets of crimes involving fleeing law enforcement to be same or similar, despite factual differences in underlying theft charges and addition of felony-murder charge in only one case); *State v. Cruz*, 297 Kan. 1048, 1050-53, 1055-56, 307 P.3d 199 (2013) (crimes same or similar where both victims were leaving nightclub at closing time; both accosted before reaching vehicle; both had little warning before shot repeatedly; same gun used; defendant identified in both cases; both cases charged first-degree murder and criminal possession of a firearm); *State v. Gaither*, 283 Kan. 671, 687, 156 P.3d 602 (2007) (crimes same or similar where both victims were drug dealers; defendant on quest for drugs during both; both victims shot with 9 mm handgun; both occurred in private dwellings in a five-day time span); *Barksdale*, 266 Kan. at 506-10 (crimes same or similar where both crimes were murder; victims killed in similar manner; robbery was common motive in both cases).

Based on the uncontested facts set forth above, we find substantial competent evidence supports the district court's legal conclusion that the March and May crimes were of the same or similar character.

## 2. *Condition three: common scheme or plan*

West also challenges the district court's ruling that the March and May crimes were part of a common scheme or plan. Because the March and May crimes were properly joined as offenses of the same or similar character under K.S.A. 22-3202(1), we need not address West's argument that the district court also erred in finding the crimes constituted parts of a common scheme or plan.

### B. *Step two: abuse of discretion in denying motion to sever*

Having found a statutory basis for joinder, we must next determine whether the district court abused its discretion in denying the motion to sever. See K.S.A. 22-3202(1) (providing that charges "may" be joined). A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Younger*, 320 Kan. 98, 137-38, 564 P.3d 744 (2025). On appeal from the denial of a motion to sever, the party claiming error has the burden to establish a clear abuse of discretion. See *Smith-Parker*, 301 Kan. at 161.

To that end, West argues the district court committed an error of law by failing to consider whether joinder of the crimes would be prejudicial. He claims that allowing the March and May incidents to be tried together lowered the State's burden to disprove his claims of self-defense and led to the prejudicial admission of other-crimes evidence under K.S.A. 60-455 that would otherwise have been inadmissible.

But this court has routinely rejected West's argument that failure to sever resulted in the prejudicial admission of other-crimes evidence under K.S.A. 60-455. See *Smith-Parker*, 301 Kan. at 161. "'Kansas case law and the provisions of K.S.A. 22-3202(1)

14

make it clear that joinder is not dependent upon the other crimes being joined meeting the admissibility test set forth in K.S.A. 60-455.'" 301 Kan. at 161 (quoting *Gaither*, 283 Kan. at 688).

C. *Step three: prejudice*

Absent any error, there is no reasonable probability that the verdict would have been different as the result of an error. *Hurd*, 298 Kan. at 564. And even if this court were to agree that the district court abused its discretion in failing to consider the prejudicial effect of the joinder, we may readily conclude that no prejudice occurred as a result. The jury was instructed that each crime charged against West was a separate and distinct offense and that it "must decide each charge separately on the evidence and law applicable to it, uninfluenced by your decision as to any other charge." We have routinely held that such an instruction negates any jury confusion or prejudicial effect of trying a person on multiple counts. See, e.g., *Cruz*, 297 Kan. at 1057-58; *Gaither*, 283 Kan. at 687; *Barksdale*, 266 Kan. at 510. We presume that juries follow the instructions given. *State v. Perez*, 306 Kan. 655, 672, 396 P.3d 78 (2017). And it appears the jury did so here, given that it acquitted West of the May aggravated assault charge. See *Cruz*, 297 Kan. at 1058 ("Sometimes, we view acquittals as compelling evidence of a jury's ability to differentiate between charges joined for trial."); *Bunyard*, 281 Kan. at 401-02 (rejecting defendant's argument related to "jumbling defenses"; such a claim was "inscrutable" when jury acquitted defendant of two of three counts).

D. *Conclusion*

In sum, we conclude substantial competent evidence supports the district court's legal conclusion that the March and May crimes were of the same or similar character under K.S.A. 22-3202(1). We also conclude West failed to demonstrate that the court

15

abused its discretion in denying his motion to sever or that he was prejudiced by the court's decision.

II.  *Jury instructions*

At trial, the district court instructed the jury on West's claim of self-defense. Over West's objection, the court also issued a related instruction that limited West's ability to claim self-defense if the jury found he was the initial aggressor.

In addition, the court instructed the jury on three lesser included offenses of premeditated first-degree murder, including intentional second-degree murder, voluntary manslaughter under the "unreasonable but honest belief" theory of that offense, and involuntary manslaughter committed as the result of a lawful act in an unlawful manner. The court declined West's request to instruct the jury on heat of passion voluntary manslaughter.

On appeal, West raises three claims of instructional error: (1) the initial aggressor instruction was legally and factually inappropriate, (2) the district court erred in refusing to instruct the jury on heat of passion voluntary manslaughter, and (3) the involuntary manslaughter instruction was legally deficient.

We follow a multi-step framework when addressing claims of instructional error. First, we consider whether the issue is reviewable; in other words, whether there is appellate jurisdiction and whether the issue is sufficiently preserved for our review. Second, we decide whether the challenged instruction was legally and factually appropriate. In doing so, we exercise unlimited review of the entire record and view the evidence in the light most favorable to the requesting party. Third, upon a finding of

16

error, we determine whether that error requires reversal or can be considered harmless. *State v. Holley*, 313 Kan. 249, 253, 485 P.3d 614 (2021).

A. *Initial aggressor instruction*

At trial, the district court instructed the jury on West's claim of self-defense:

"Defendant claims his use of force was permitted as self-defense. Defendant is permitted to use physical force against another person, including using a weapon, or threaten by words or actions to use physical force against another person, including a threat to cause death or great bodily harm, or display to another person a firearm, when and to the extent that it appears to him and he reasonably believes such physical force, threat, or display is necessary to defend himself against the other person's imminent use of unlawful force. Reasonable belief requires both a belief by defendant and the existence of facts that would persuade a reasonable person to that belief. Defendant is permitted to use against another person physical force that is likely to cause death or great bodily harm only when and to the extent that it appears to him and he reasonably believes such force is necessary to prevent death or great bodily harm to himself from the other person's imminent use of unlawful force. Reasonable belief requires both a belief by defendant and the existence of facts that would persuade a reasonable person to that belief. When use of force is permitted as self-defense, there is no requirement to retreat."

At the State's request, the court also issued a related instruction on provocation, referred to as an initial aggressor instruction:

"A person is not permitted to provoke an attack on himself with the specific intention to use such attack as a justification for inflicting bodily harm upon the person he provoked and then claim self-defense as a justification for inflicting bodily harm upon the person he provoked."

17

At the instructions conference, defense counsel objected to the initial aggressor instruction, pointing to a lack of evidence that West intended to provoke an attack. In the event the instruction was given, counsel asked the district court to include a sentence stating that "mere words or gestures by the defendant, however insulting, do not constitute adequate provocation." The court overruled defense counsel's objection to the instruction and declined to include the additional language requested by defendant, noting it was neither referenced in the pattern instructions nor required by caselaw.

On appeal, West renews his objection to the initial aggressor instruction, claiming it was not legally or factually appropriate.

At the first step of our framework for jury instruction issues, West objected to the instruction and requested the additional language, thus preserving the issue for review.

At the second step of our framework, we consider the legal and factual appropriateness of the instruction, using an unlimited standard of review of the entire record. See *Holley*, 313 Kan. at 254.

1. *Legal appropriateness*

To be legally appropriate, a jury instruction must fairly and accurately state the applicable law. *State v. Broxton*, 311 Kan. 357, 361, 461 P.3d 54 (2020); see *State v. Plummer*, 295 Kan. 156, 161, 283 P.3d 202 (2012) (An instruction that does not fairly and accurately state the law is legally infirm.). This court exercises unlimited review in deciding the legal appropriateness of an instruction. *State v. Wimbley*, 313 Kan. 1029, 1034, 493 P.3d 951 (2021).

18

The instruction at issue based on K.S.A. 21-5226(b), is consistent with the language of that statute, and is taken from the pattern instruction for Provocation of First Force as Excuse for Retaliation, PIK Crim. 4th 52.240. This instruction is generally given in situations where a factual dispute exists regarding whether the defendant was the aggressor. See PIK Crim. 4th 52.240 Comment ("It is not error to give initial aggressor instructions where the question whether defendant was an aggressor is one of fact for the jury. See *State v. Hunt*, 257 Kan. 388, 894 P.2d 178 [1995]."). The pattern instruction does not define what constitutes adequate provocation. See PIK Crim. 4th 52.240.

This court "'strongly recommend[s] the use of PIK instructions, which knowledgeable committees develop to bring accuracy, clarity, and uniformity to instructions.'" *State v. Hollins*, 320 Kan. 240, 244, 564 P.3d 778 (2025) (quoting *State v. Zeiner*, 316 Kan. 346, 353, 515 P.3d 736 [2022]). When a court follows the PIK instructions, "more than likely the instruction will be legally correct, not because of any independent legal significance of the pattern instruction, but because the committee usually writes an instruction that accurately reflects the law." *Wimbley*, 313 Kan. at 1031. But a district court may modify or add language to a pattern instruction if warranted by the circumstances of a particular case. *Hollins*, 320 Kan. at 244; *Wimbley*, 313 Kan. at 1031.

West argues that, without his requested definition of provocation, the initial-aggressor instruction failed to accurately state the law because it did not tell the jury that the provocation must be legally sufficient—that is, sufficient to objectively warrant the victim's attack. And he contends the instruction misled the jury, allowing it to disregard his claim of self-defense and the lesser included offenses.

In reviewing a district court's denial of a request to modify a pattern instruction, an appellate court does not view the added language in isolation. "Rather, the appellate court

considers all the jury instructions as a whole and decides whether, even without language requested by a party, the instructions properly and fairly stated the applicable law or whether it is reasonable to conclude the instructions could have misled the jury." *Wimbley*, 313 Kan. at 1039; see *State v. Johnson*, 321 Kan. 357, 363, 580 P.3d 20 (2025) ("When a party argues an instruction was incomplete or unclear because it lacked a definition, we look beyond whether the omitted definition would have been legally accurate to whether the given instruction *needed* that definition to accurately or clearly reflect the law."); *Hollins*, 320 Kan. at 244 (Appellate courts consider jury instructions as a whole without isolating any one instruction.); *State v. Norris*, 226 Kan. 90, 95, 595 P.2d 1110 (1979) ("The trial court need not define every word or phrase in the instructions. It is only when the instructions as a whole would mislead the jury, or cause them to speculate, that additional terms should be defined.").

This court has long held that an initial aggressor instruction is a correct statement of the law. See *Hunt*, 257 Kan. at 391-94 (affirming district court's decision to give self-defense and initial aggressor instructions; reasoning that instructions correctly stated the law, question of whether defendant was initial aggressor was for jury and, if jury found defendant was not initial aggressor, jury was free to "disregard the limit on the defendant's right to use self-defense"); *State v. Beard*, 220 Kan. 580, 581-82, 552 P.2d 900 (1976) (initial aggressor instruction was correct statement of law; informed jury of law related to limits on asserting self-defense).

Contrary to West's argument, the initial aggressor instruction did not undermine his theory of defense because the district court separately provided a self-defense instruction that correctly stated the law governing his self-defense claim. See K.S.A. 21-5222. However, a defendant's right to invoke self-defense is limited under K.S.A. 21-5226, and the initial aggressor instruction simply sets forth one such limitation on a defendant's ability to claim self-defense. See K.S.A. 21-5226(b). The instruction did not

20

tell the jury that West was the initial aggressor or require the jury to find that he was; the determination of whether West was the initial aggressor remained with the jury. See *Hunt*, 257 Kan. at 394. Indeed, the jury could have considered the initial aggressor instruction and, concluding the instruction did not apply to its view of the facts, embraced West's theory of self-defense.

Because the instructions issued by the district court properly and fairly stated the applicable law on self-defense, the initial aggressor instruction given in this case was legally appropriate.

### 2. *Factual appropriateness*

In determining whether an instruction was factually appropriate, courts must determine whether there was sufficient evidence, viewed in the light most favorable to the requesting party, that would have supported the instruction. See *State v. Mendez*, 319 Kan. 718, 727, 559 P.3d 792 (2024).

West argues the initial aggressor instruction was factually inappropriate because the evidence did not show that he intended to provoke Robinson. West contends that the evidence that he taunted Robinson and called him a coward did not constitute adequate provocation to warrant the instruction. West suggests that an initial aggressor instruction is only appropriate in circumstances where the defendant first makes physical contact with the victim and that mere words or gestures cannot constitute adequate provocation under K.S.A. 21-5226(b). See *State v. Riley*, 137 Wash. 2d 904, 911, 976 P.2d 624 (1999) ("[W]ords alone do not constitute sufficient provocation. Therefore, the giving of an aggressor instruction where words alone are the asserted provocation would be error.").

But K.S.A. 21-5226(b) imposes no such limitation, and we will not read these words into the statute. See *State v. Keys*, 315 Kan. 690, 698, 510 P.3d 706 (2022) (courts should refrain from reading something into a statute that is not readily found in its words). The language proposed by defense counsel—that "mere words or gestures by the defendant, however insulting, do not constitute adequate provocation"—is taken from caselaw discussing legally sufficient provocation in the context of voluntary manslaughter and thus is irrelevant to the statute here. See, e.g., *State v. Bernhardt*, 304 Kan. 460, 476, 372 P.3d 1161 (2016) ("Mere words or gestures, however offensive, do not constitute legally sufficient provocation for a finding of voluntary manslaughter.").

West's argument is undermined by a long line of cases in Kansas finding that a defendant need not initiate physical contact to provoke a victim within the meaning of K.S.A. 21-5226. See, e.g., *State v. Collins*, 311 Kan. 418, 430, 461 P.3d 828 (2020) (defendant initially provoked victim's use of force against him when he verbally rekindled a conflict); *State v. Salary*, 301 Kan. 586, 589-91, 596-97, 343 P.3d 1165 (2015) (finding defendant was initial aggressor who was ineligible for self-defense instruction where defendant refused victim's order to leave his house and leaving would have ended any confrontation; instead, defendant left the room before returning with a loaded firearm and shooting victim); *State v. Meyers*, 245 Kan. 471, 472, 476, 781 P.2d 700 (1989) (finding defendant would not have been entitled to self-defense instruction where he provoked victims by throwing firecrackers and leading them on a high-speed chase); *Beard*, 220 Kan. at 581-82 (finding initial aggressor instruction warranted where defendant left the scene where he was beaten by victims and returned an hour later saying, "I told them I would be back," before shooting victims); *State v. Mainville*, No. 126,766, 2025 WL 2267533, at *1, 4-6 (Kan. App. 2025) (unpublished opinion) (defendant was initial aggressor who was not entitled to self-defense instruction where victim was yelling at defendant from neighboring property and was walking away when defendant came out of his house and pointed a weapon at victim); *State v. Miller*, No.

119,763, 2019 WL 3850689, at \*5 (Kan. App. 2019) (unpublished opinion) (self-defense instruction factually inappropriate where defendant left a situation but chose to return and thus became the initial aggressor).

Based on the evidence that West left the verbal altercation with Robinson before taunting him and calling him a coward from across the street, the jury was entitled to decide whether West provoked Robinson. See *State v. Smith*, 278 Kan. 45, 50, 92 P.3d 1096 (2004) ("Some evidence of provocation is enough to support the [initial aggressor] instruction."); *State v. Adam*, 257 Kan. 693, 702-03, 896 P.2d 1022 (1995) (initial aggressor instruction justified although evidence of provocation by defendant was slim); *Hunt*, 257 Kan. at 394 (question of whether defendant was an aggressor is a fact question for the jury); *Beard*, 220 Kan. at 582 ("Whether defendant was an aggressor remained a question for the jury.").

### 3. *Conclusion*

Because the initial aggressor instruction was legally and factually appropriate, the district court did not err in giving it. As a result, we need not consider whether any error requires reversal.

### B. *Heat of passion voluntary manslaughter instruction*

K.S.A. 21-5404 defines the crime of voluntary manslaughter as "knowingly killing a human being committed:  (1) Upon a sudden quarrel or in the heat of passion; or (2) upon an unreasonable but honest belief that circumstances existed that justified use of deadly force . . . ."

As a lesser included offense of first-degree murder, the district court instructed the jury on voluntary manslaughter under the "unreasonable but honest belief" theory. Over West's objection, however, the court declined to also instruct on voluntary manslaughter based on a sudden quarrel or heat of passion. The court found the evidence did not support that theory because the animosity between West and Robinson "had been building up for so long" and the "argument had been going on for so long." West contends the district court erred in refusing his requested instruction.

At the first step of our jury instruction analysis, West requested the instruction and thus preserved this issue for our review.

At the second step, where we evaluate legal and factual appropriateness, the requested instruction was legally appropriate because voluntary manslaughter is a lesser degree of homicide when compared to the charged first-degree murder. *State v. Thille*, 320 Kan. 435, 438, 570 P.3d 18 (2025) (voluntary manslaughter instruction legally appropriate as lesser included offense of first-degree murder); *State v. Pulliam*, 308 Kan. 1354, 1362, 430 P.3d 39 (2018) ("An instruction on a lesser included crime is legally appropriate."); see K.S.A. 21-5109(b)(1) (A lesser included crime includes a "lesser degree of the same crime.").

Thus, the question before us is whether the instruction was factually appropriate. In general, an instruction on a lesser included offense is factually appropriate if "there is some evidence, viewed in a light most favorable to the defendant, emanating from whatever source and proffered by whichever party, that would reasonably justify the defendant's conviction for that lesser included crime." *State v. Berkstresser*, 316 Kan. 597, 601, 520 P.3d 718 (2022); see K.S.A. 22-3414(3) ("[T]he judge *shall* instruct the jury as to the crime charged and any such lesser included crime.") (Emphasis added.);

24

*State v. Williams*, 295 Kan. 506, 521, 286 P.3d 195 (2012) ("[T]he giving of lesser included crime instructions is not a matter of discretion with the trial judge.").

Again, K.S.A. 21-5404(a)(1) defines voluntary manslaughter as knowingly killing a human being "[u]pon a sudden quarrel or in the heat of passion." "'Heat of passion' is 'any intense or vehement emotional excitement of the kind prompting violent and aggressive action, such as rage, anger, hatred, furious resentment, fright, or terror,' based 'on impulse without reflection.'" *Thille*, 320 Kan. at 439 (quoting *State v. Brownlee*, 302 Kan. 491, 513, 354 P.3d 525 [2015]); see PIK Crim. 4th 54.170. A "sudden quarrel" is one form of heat of passion. *Brownlee*, 302 Kan. at 513.

Heat of passion killings require a showing of sufficient provocation under an objective standard. *State v. Gentry*, 310 Kan. 715, 722-23, 449 P.3d 429 (2019) (Reducing a homicide from murder to voluntary manslaughter requires "'adequate provocation that deprives a reasonable person of self-control and causes that person to act out of passion rather than reason.'"). Ongoing and protracted interactions do not typically provide factual support for a heat of passion voluntary manslaughter instruction. *State v. Lowry*, 317 Kan. 89, 95, 524 P.3d 416 (2023); see, e.g., *Bernhardt*, 304 Kan. at 476-77 (victim slapping defendant during ongoing argument not objectively sufficient to warrant heat of passion voluntary manslaughter instruction); *State v. Johnson*, 290 Kan. 1038, 1044, 1045-46, 236 P.3d 517 (2010) (lengthy and protracted disagreement did not constitute evidence of a sudden quarrel sufficient to support voluntary manslaughter instruction); compare *State v. Graham*, 275 Kan. 831, 838-40, 69 P.3d 563 (2003) (heat of passion voluntary manslaughter instruction warranted where quarrel that immediately led to murder occurred suddenly and stabbing occurred during physical altercation that immediately followed sudden quarrel); *State v. Hill*, 242 Kan. 68, 72-73, 76, 744 P.2d 1228 (1987) (failing to instruct on heat of passion voluntary manslaughter was error

25

where evidence showed victim assaulted and insulted defendant immediately before defendant shot victim).

West argues the jury could have found sufficient provocation existed here based on Robinson's sudden physical attack after Robinson ran across the street and began punching and shoving West while threatening to "beat [his] ass" and "[beat him] to death." West notes that the surveillance video time stamp shows that he fired the gun at Robinson about a minute and a half after the physical attack began and only three minutes after the men first engaged inside the QuikTrip.

But West's focus on the suddenness of Robinson's attack in the alley ignores the totality of the circumstances present here. The altercation between the two men began inside the QuikTrip when Robinson confronted West about his loud music and escorted him out of the store. The argument continued as they walked through the parking lot to the edge of the street. After West crossed the street into the alley, the argument did not stop. Instead, it appears that West taunted Robinson into crossing the street, where the two men began fighting or wrestling before West shot Robinson. But the shooting was not immediate. Just before the shooting, a witness saw Robinson gesture with his hands in an apparent attempt to calm West down. And West testified that before shooting Robinson, he prepared to defend himself by unzipping his backpack where he carried his firearm because he believed doing so was necessary to protect his own life. This testimony reflects a deliberate decision by West to shoot Robinson, not that he shot Robinson because he suddenly lost control.

Despite the short window of time between West's first interaction with Robinson and the fatal shot, the evidence does not reasonably support a conviction for heat of passion voluntary manslaughter because the ongoing confrontation between the two men cannot be described as a sudden quarrel and West's actions were not done in the heat of

passion. Under these circumstances, a heat of passion voluntary manslaughter instruction was not factually appropriate. As a result, the district court did not err in refusing West's request to issue the instruction.

### C. *Involuntary manslaughter instruction*

As another lesser included offense of first-degree murder, the district court instructed the jury on imperfect self-defense involuntary manslaughter based on the commission of a lawful act in an unlawful manner. West does not contend the district court erred by giving an involuntary manslaughter instruction or by including the statutory phrase "lawful act in an unlawful manner." Instead, he argues for the first time on appeal that the instruction was legally incomplete because the court did not provide additional language defining that phrase.

This issue is governed by the same multi-step standard of review set forth above. *Holley*, 313 Kan. at 253. But at the final step, we review for clear error because West did not request the additional language or object to the involuntary manslaughter instruction at trial. See K.S.A. 22-3414(3). To show clear error, West must prove that the instruction was legally or factually inappropriate, and we must be firmly convinced the jury would have reached a different verdict absent the error. As the party claiming clear error, West has the burden to show both error and prejudice. *State v. Crosby*, 312 Kan. 630, 639, 479 P.3d 167 (2021).

When a party challenges the omission of unrequested additional explanatory language in a jury instruction, the question is not whether the omitted language would have been legally correct in the abstract. Instead, we consider whether the instruction—viewed as a whole—fairly and accurately stated the law without the proposed definition and whether the additional language was necessary to prevent the jury from being misled.

27

See *Johnson*, 321 Kan. at 363 ("[W]e look beyond whether the omitted definition would have been legally accurate to whether the given instruction *needed* that definition to accurately or clearly reflect the law."); *Wimbley*, 313 Kan. at 1039.

K.S.A. 21-5405(a)(4) defines involuntary manslaughter as the killing of a human being "during the commission of a lawful act in an unlawful manner." Consistent with the statute and PIK Crim. 4th 54.180, the district court instructed the jury that the State was required to prove that West killed Robinson and that "[t]he killing was done during the commission of a lawful act in an unlawful manner." Again, West does not challenge the accuracy of this language; he only contends the instruction should have included an additional definition explaining the meaning of "lawful act in an unlawful manner."

West correctly notes that Kansas courts have described involuntary manslaughter under K.S.A. 21-5405(a)(4) as a form of imperfect self-defense involving the lawful exercise of self-defense with excessive force. *State v. James*, 309 Kan. 1280, 1302, 443 P.3d 1063 (2019). From this premise, he argues the jury should have been instructed that the phrase "lawful act in an unlawful manner" refers to the use of excessive force in otherwise lawful self-defense. Because no such explanatory language was provided, West contends the instruction failed to adequately inform the jury of the applicable law.

K.S.A. 21-5405(a)(4) does not define the phrase "lawful act in an unlawful manner." The Comment to PIK Crim. 4th 54.180, the pattern instruction for this type of involuntary manslaughter, states: "The use of excessive force may be found to be an 'unlawful manner' of committing the 'lawful act' of self-defense, and thereby supply an element of involuntary manslaughter." But this definition is not included in the body of the pattern instruction. See PIK Crim. 4th 54.180.

As discussed, this court strongly recommends the use of PIK instructions, and absent a need under the facts of a case to modify an instruction, they should be used by district courts. See *Hollins*, 320 Kan. at 244 (Knowledgeable committees develop PIK instructions to bring accuracy, clarity, and uniformity to jury instructions.).

The district court's instruction accurately tracked both K.S.A. 21-5405(a)(4) and PIK Crim. 4th 54.180. The question, therefore, is whether the court was required to go further and provide the additional definition West now proposes. We conclude it was not. The jury was separately instructed on self-defense, and neither the statute nor the pattern instruction requires a further definition of "lawful act in an unlawful manner." See *State v. Collins*, No. 125,971, 2024 WL 3084395, at *18-20 (Kan. App. 2024) (unpublished opinion) (no error in district court's response to jury's question seeking definition of "lawful act in an unlawful manner" where court responded by telling jury to rely on its common knowledge and experience and to refer to the jury instructions; pattern instructions do not require jury to be instructed on this definition); *State v. Collins*, No. 117,409, 2018 WL 5305661, at *10 (Kan. App. 2018) (unpublished opinion) (no error in district court's failure to provide imperfect self-defense definition in involuntary manslaughter instruction; instruction was consistent with statute and pattern instructions); *State v. Falcon*, No. 81,121, 1999 WL 35814798, at *4 (Kan. App. 1999) (unpublished opinion) (no clear error in district court's failure to define the concept of "lawful act in an unlawful manner"; definition is not required by caselaw or pattern instructions and jury was instructed in accordance with pattern instructions).

Considering the instructions as a whole, the jury was properly and fairly informed of the applicable law.

III.  *Motion in limine*

West argues the district court erred in granting the State's motion in limine because it prevented him from introducing evidence relevant to his claim of self-defense.

*Additional relevant facts*

Before the preliminary hearing, West filed an amended motion to dismiss based on self-defense immunity. The district court held a combined preliminary hearing/hearing on the motion to dismiss. At the preliminary hearing, a police investigator testified that she collected Robinson's personal property from the hospital, which included a set of brass knuckles. During cross-examination of multiple police witnesses, defense counsel elicited testimony that Robinson was a former Wichita Police Department officer and that officers are not trained to use or authorized to carry brass knuckles. Counsel also asked these witnesses if they knew that Robinson carried brass knuckles. At the conclusion of the hearing, the parties presented their arguments on the motion to dismiss. Defense counsel argued, in relevant part, that Robinson was the aggressor and that he was "down for a fight" when he ran across the street to fight West:

> "I don't know what happened to these brass knuckles, there's no evidence that Mr. Robinson was wearing 'em, but let's look into his mind, Mr. Robinson's mind when he crossed that street.
>
> "What was he there for? Mr. Robinson's down for a fight. He's down for a fight so much that he runs across the street, almost getting hit. He's down for a fight so much he carries brass knuckles. I'm not saying he used 'em that day."

After considering the parties' arguments, the district court denied the motion to dismiss and found there was probable cause to support the State's charges against West.

30

In ruling on the motion to dismiss, the court noted the lack of evidence that Robinson ever displayed a weapon, including brass knuckles, during the encounter.

Before trial, the State filed a motion in limine seeking to prevent West from eliciting testimony about or referring to the brass knuckles found in Robinson's belongings at the hospital. The State argued such evidence was irrelevant because there had been no showing that Robinson wore brass knuckles during the altercation, and West never claimed he saw Robinson wearing them. The State noted it was just as likely that Robinson had found them on the QuikTrip premises or confiscated them from someone in his capacity as a security guard. Finally, the State claimed that mention of the brass knuckles would improperly prejudice the jury by making it appear that Robinson was carrying or using an unauthorized and potentially illegal weapon at the time of the shooting.

In response, defense counsel argued that the brass knuckles evidence was relevant to West's claim of self-defense because it constituted circumstantial evidence of Robinson's mindset as the initial aggressor who placed West in fear for his life.

The district court granted the State's motion, ruling that evidence of the brass knuckles was irrelevant absent a showing that West was aware of their presence before or during the encounter, or that Robinson had displayed or used them during the incident.

At trial, defense counsel proffered a photograph of the brass knuckles to preserve the issue for appellate review. The district court confirmed its prior ruling that the evidence was inadmissible. Despite the court's ruling, West repeatedly testified that he saw Robinson put something on his hands during the encounter in the alley and also said that Robinson "was found with brass knuckles." After sustaining the State's objection, the district court instructed the jury to disregard West's comment. The court later said it

31

would consider holding West in contempt for violating the in-limine order, but the record does not reflect that the court ever did so.

*Discussion*

A defendant has a constitutional right to present the theory of his or her defense. A defendant's fundamental right to a fair trial is violated if evidence integral to that theory is excluded. But the right to present a defense is subject to statutory rules and caselaw interpretation of rules of evidence and procedure. *State v. Smith*, 320 Kan. 62, 80, 563 P.3d 697 (2025).

Whether an evidentiary ruling has violated the defendant's constitutional right to present a defense is subject to unlimited appellate review. See *State v. White*, 316 Kan. 208, 212-13, 514 P.3d 368 (2022). "'To constitute error, the excluded evidence supporting the defense theory must be relevant, noncumulative, and admissible.'" *Smith*, 320 Kan. at 80 (quoting *State v. Waldschmidt*, 318 Kan. 633, 657, 546 P.3d 716 [2024]).

For conduct to be statutorily justified based on a claim of self-defense, it must meet a two-part test. The subjective prong requires a showing that the defendant sincerely and honestly believed it was necessary to use deadly force to defend himself or herself, while the objective prong requires a showing that a reasonable person in the defendant's circumstances would have perceived the use of deadly force in self-defense as necessary. See K.S.A. 21-5222(b); *State v. Macomber*, 309 Kan. 907, 916-17, 441 P.3d 479 (2019).

When a defendant raises a claim of self-defense, evidence of the victim's violent or turbulent character may be relevant to establish the defendant's state of mind. *State v. Walters*, 284 Kan. 1, 10-11, 159 P.3d 174 (2007). To establish relevance, however, there must be some logical connection between the asserted facts and the inference or result

they are intended to establish. See K.S.A. 60-401(b) ("'Relevant evidence' means evidence having any tendency in reason to prove any material fact."); *State v. Alfaro-Valleda*, 314 Kan. 526, 533, 502 P.3d 66 (2022) (Evidence is material when the fact it supports is in dispute and "has some real bearing on the decision in the case."); *State v. McCormick*, 305 Kan. 43, 47, 378 P.3d 543 (2016) (Evidence is probative if it tends to prove a material fact—if it "furnishes, establishes, or contributes toward proof.").

West does not allege that the brass knuckles evidence was relevant to his state of mind. Nor could he credibly do so, because there is no evidence in the record showing West was aware that Robinson had brass knuckles on his person or that Robinson otherwise used or displayed them before or during their encounter.

Instead, West contends the brass knuckles evidence was relevant to his theory of self-defense because it constituted circumstantial evidence tending to prove *Robinson's* state of mind at the time of their encounter and to rebut the State's claim that Robinson only crossed the street because he was provoked by West.

West's argument is unpersuasive because Robinson's state of mind is not material to the issue of whether West is entitled to claim self-defense. And there is no logical connection between the brass knuckles and Robinson's state of mind. West seeks to use Robinson's possession of the brass knuckles to infer that Robinson was the aggressor, but as discussed by the State in its motion in limine, we do not know how the brass knuckles came into Robinson's possession. We can only speculate about whether they belonged to him or whether he found or confiscated them in the course of his duties as a security officer. Simply put, the brass knuckles evidence is neither probative nor material and it was therefore irrelevant. The district court did not err in granting the State's motion in limine to exclude this evidence.

33

IV. *Cumulative error*

West's final argument is that the cumulative effect of the alleged errors violated his constitutional right to a fair trial.

Cumulative trial errors, considered collectively, may require reversal of a defendant's conviction when the totality of the circumstances establishes that the defendant was substantially prejudiced by the errors and denied a fair trial. *State v. Guebara*, 318 Kan. 458, 483, 544 P.3d 794 (2024).

Because we find no errors by the district court, West's cumulative error argument necessarily fails. See *Lowry*, 317 Kan. at 100 (The cumulative error rule does not apply if there are no errors.).

Affirmed.